# WISWALL v. TICKNOR and DAY.

1. T. executed a mortgage to D., on the 28th April, 1840, by which to secure the payment of certain debts, (the amount or description of which are not stated,) he conveyed real estate, slaves, house-hold furniture, and " a stock of groceries, chandlery, goods, wares and merchandize," reserving the right to " retain in his possession, and use the goods, wares, merchandize, &c. and to sell and dispose of the same" to satisfy the mortgage debt, and if the said debt was not paid on or before the 1st December, 1841, then the mortgagee was authorised to sell and dispose of the mortgaged property, giving thirty days notice, &c. T. retained the possession of the mortgaged property for more than a year after the 1st of December, 1841, sold in his own name, the stock of goods, and with the proceeds, frequently replaced it—sold the slaves, and some other personal property, and invested the proceeds in trade—paid the mortgagee from the sales of the store, more than ten thousand dollars, but without diminishing the mortgaged debt, it being re-invested in goods and merchandize: *Held*, 1. That it was a suspicious circumstance that no schedule or inventory of the property conveyed, or the debt to be secured, accompanied the deed, although this of itself would

not be evidence of fraud, it would, unless the omission was explained, add weight to any other objection that might exist to the deed. 2. That the retention of possession, by the mortgagor, after the law day had passed, was a badge of fraud. 3. That this inference of fraud, from the possession, so far from being repelled, was confirmed by the facts admitted; that the mortgagee permitted the mortgagor to retain and use the property as his own, by selling it in his own name, and by re-investing the proceeds in other articles of merchandize, to be again sold, and the proceeds again re-invested—that whatever might have been the intention of the parties, these acts were, in law, evidence that the deed was made with the intention to delay, hinder, and defraud creditors, and therefore, as against them, void.

2. Whether a mortgage of articles of merchandize, which the mortgagor has the right to *use*, sell and dispose of, for the purpose of paying the mortgage debt, is not fraudulent *per se—Quere*.

Appeal from the Chancery Court at Mobile.

The bill was filed by the plaintiff in error, and charges, that he obtained a judgment against Ticknor in the circuit court of Mobile, for $2,233 17, that execution has issued thereon, and been returned, no property found. That Ticknor, about the 28th April, 1840, for the purpose of defrauding his creditors, executed to one Day, a conveyance or deed, of all his property, real and personal, a dwelling house, with his furniture, plate, and a storehouse and stock of groceries, carriage and horses, slaves, and interest in a steam-boat. That Ticknor was not indebted to Day in any large amount, nor was Day bound as surety for him, as is stated in the conveyance, but that it was a contrivance to enable Ticknor to retain possession of his property, free from the claims of his creditors. That from the date of the deed, Ticknor has remained in possession of the property, occupying the houses, hiring, and receiving the rents, selling the groceries, and replacing the stock, and in all respects, using it as his own. That he has effects, out of which the judgment might be satisfied, but that in consequence of this pretended mortgage, it cannot be reached by execution at law, &c. &c. An injunction was granted.

The deed is made an exhibit to the bill, and bears date the 28th April, 1840. It recites, that for and in consideration of the sum of $25,000, in hand paid by Day to Ticknor, the latter conveys to the former certain lots of land in the city of Mobile, particularly described, and then proceeds thus: "And the said party of the first part, in consideration as aforesaid, hath granted, bargained,

&c. unto the said party of the second part, his heirs, &c. a cer-
tain negro woman named Minta, with her child; also, all the right,
title and interest which the party of the first part, has in and to
the steam-boat Factor, it being one-fourth part; also, all and sin-
gular, the stock of groceries, chandlery, goods, wares and mer-
chandise, now being in and on the first above described premises;
also, a barouche, carriage and two horses, and all the household
furniture of the said party of the first part, consisting of cabinet
ware, beds and bedding, paintings and engravings, silver ware,
crockery and glass ware, table furniture, kitchen furniture, &c:
*Provided, nevertheless,* and this instrument is made upon the ex-
press condition, and with the stipulations, qualifications and limi-
tations following, to wit: Whereas, the said party of the first part,
is indebted to the party of the second part, in sundry large sums
of money, for money had and received; and also, for money paid,
laid out and expended by said party of the second part, for the
use and benefit of the party of the first part, and is also largely
indebted to said party of the second part, on book account, and
for goods, wares and merchandise sold, and sundry large a-
mounts on bonds, bills and notes, and other contracts; and where-
as, the said party of the second part, has by various endorse-
ments of notes and other obligations, and by acceptances of bills
of exchange, and by assuming to pay other debts of the party of
the first part, and by becoming security on various instruments of
writing at the special instance and request of the party of the
first part, hath made himself liable to pay both, now and hereafter,
as said liabilities may from time to time fall due, large sums
of money on account of the party of the first part.

"Now, if the said party of the first part, should well and truly
pay on or before the 1st day of December, 1841, all his indebted-
ness to the party of the second part, and shall pay and discharge
all the said liabilities, so that the party of the second part shall be
saved harmless therefrom; then, and in that case, these presents,
and every thing and matter herein contained, shall cease, deter-
mine, and be utterly void. And it is further covenanted and mu-
tually agreed by, &c. that the said party of the first part, and his
assigns, shall and may hold and retain in his possession and use,
the goods, wares and merchandise; and also, the other personal
property before described and mortgaged; and also, the above de-
scribed mortgaged real estate, and to occupy the same, and to

hire the same, and receive the rents therefor; and also, to sell and dispose of the goods, wares, furniture and the other personal property as aforesaid, and from the nett proceeds thereof, to pay and satisfy the above indebtedness, and the said liabilities, rendering an account thereof to the said party of the second part, as often as he may be reasonably thereto requested.

"And it is further agreed, by and between the said parties, that in case it shall so happen, the party of the first part, shall not pay or cause to be paid, his indebtedness to the said party of the second part, as aforesaid, on or before the 1st December, 1841, and shall not pay or discharge all the liabilities aforesaid, so as to save him harmless, the said party of the second part, shall be, and hereby is authorised and empowered to dispose of the above real estate, either at private sale or at auction, as he may think best, for cash, and his conveyance therefor, shall be as binding as if made by the party of the first part, giving thirty days notice of such sale in some newspaper published in the city of Mobile."

Signed and sealed by John Ticknor, acknowledged on the 26th June, 1840, before a notary public, and recorded in the county court clerk's office.

Ticknor, by his answer, admits the execution of the deed, and states the value of the property conveyed by the deed at $23,850, exclusive of bad and doubtful debts; that one of the lots conveyed by the deed, was under mortgage to its value, and therefore, not brought into the account. That one of the lots estimated to be worth $20,000, was incumbered in various ways to the amount of $16,744 03, which amount has been discharged by the defendant Day. That on the 31st December, 1839, he was indebted to Day in the sum of $10,673 60, for goods purchased and paid for by him for respondent, and in the further sum of $1,009, also, for goods purchased for him—In the further sum of $4,000, for money lent on the 14th Dec. 1838, for which he held his note—Also, in the sum of $3,000, for money lent on the 10th June, 1839, for which he held his note—In the further sum of $4,000 for money paid for him by Day to Pope & Powers, on the 27th March, 1840, and that to secure these debts, the deed was made.

He admits that he has retained possession of all the property (except the house sold under mortgage) since the date of the deed; that he has done business under his own name, and kept his books in his own name, under the direction of Day and the pro-

visions of the deed. He denies that he is in possession of any personal property upon which Day has not a *bona fide* claim, but that all the property in his possession belongs absolutely to Day. That Day has paid all the liabilities assumed by him before mentioned—that he has not reduced his indebtedness to Day in any way, although he has paid to said Day from the proceeds of the store, the sum of $10,670, but the said Day has paid more than that amount in addition to the sums herein before mentioned, for goods, &c. That the household furniture is unsold, and is worth about $400; that the stock of groceries have been sold and replaced constantly, by respondent, who carries on the business for Day, at his risk, and for his benefit; that the steam-boat was sold under a decree in admiralty, and did not bring the amount of the decree; that the two slaves, the barouche and horse, were sold, and the money applied, by the direction of Day, in the purchase of goods for the store. He denies all fraud, and insists that the conveyance was made *bona fide* to secure Day. He admits his indebtedness to complainant and others, as stated in the bill.

The answer of Day is in substance, the same as that of Ticknor.

Upon the coming in of the answers, the complainant moved for the appointment of a receiver, and the defendants moved for a dissolution of the injunction. The chancellor considering the equity of the bill to be destroyed by the answers, dissolved the injunction, and overruled the motion for the appointment of a receiver, from which order the chancellor allowed this appeal.— The appellant now assigns for error, the decree of the chancellor, dissolving the injunction, and refusing to appoint a receiver.

PECK & CLARKE, for appellants. They insisted, 1st, that the mortgage, as to creditors, was fraudulent on its face; among other things, because it did not show the debt it was intended to secure, when contracted, when due, nor the amount, and if for no other reason, because other creditors have the right to pay the debt, it was made to secure and take the benefit of it, [Aik. Dig. 208, § 6,] which certainly embraces mortgages as well as deeds of trust.— They further insisted that this was in law a deed of trust, and not a mortgage.

2. If not void on its face, as to creditors, certainly it contains

many badges of fraud, which so far from being explained, are confirmed by the answers.

3. That a receiver should have been appointed. [2 Paige, 342; 4 id. 576.]

4. For the jurisdiction of the court in such a case as the present, see 20 Johns. 554, and the case there cited.

ORMOND, J.—The counsel for the plaintiff in error, insists that the mortgage by which the property sought to be reached by this bill, is conveyed to the defendant Day, is fraudulent and void, as to creditors, upon its face.

The conveyance bears date 28th April, 1840, by which, for the consideration as expressed in the deed Ticknor conveys to Day certain real and personal property, among the latter being a "stock of groceries, chandlery, goods, wares and merchandise," upon condition that, whereas, the grantor was indebted to Day "in sundry large sums of money due on book account, and for goods, wares and merchandise sold, and sundry large amounts on bonds, bills and notes and other contracts," and also for debts upon which Day was bound as his surety; but if the debts were discharged, and Day saved harmless from his suretyship, on or before the 1st December, 1841, then the deed to be void; otherwise, Day was empowered to enter and sell at public or private sale, on thirty days notice, the mortgaged property. The deed also contains a covenant, that the grantor shall retain in his possession, and use the goods, wares and merchandise, and the other property conveyed, and sell and dispose of the goods, wares, &c. and from the nett proceeds thereof, pay and satisfy the above indebtedness, rendering an account thereof to Day. The deed was executed by Ticknor only.

It is certainly a suspicious circumstance, that no schedule accompanies the deed, from which the value of the property conveyed, could be ascertained, or the amount of the debt it was made to secure, as was held by this court in the case of Cummings & Cooper v. McCullough, adm'rx, [5 Ala. 324.] It is not the usual and ordinary mode in which fair transactions are conducted, by which a debtor withdraws his property from the payment of all his debts, and confines it to the payment of one or more; and although it would not of itself be evidence of fraud,

the omission would, unless explained, add weight to any other objection that might exist to the deed.

The provision in the deed, that the grantor shall have the possession and the right to sell and dispose of the goods, wares and merchandise, and other personal property conveyed by the deed, raises a question of much graver import.

In Ravisies v. Alston, trustee, [5 Ala. 297,] a deed of trust, conveyed among other things, corn, fodder and bacon, and gave to the trustee the power to manage the plantation during the current year, and devoted the proceeds thereof to the payment of the debts, to secure which the deed was made. The court sustained the deed upon the ground that the perishable articles, corn, fodder and bacon, which would be destroyed in the use, would be re-produced upon the plantation, and sold by the trustee at the end of the year. But the court added, "we do not doubt that a stipulation in a deed of trust, reserving property for the use of the grantor, which must be exhausted in such use, is fraudulent and void. This is the doctrine of the supreme court of Tennessee, as held in 3 Yerger, 502; 4 id. 541, 8 id. 419, and Richmond v. Crudup, Meig's R. 581.

So, in Cunningham v. Freeborn, [11 Wendell, 255,] an assignment by a debtor was supported, which permitted the trustee to sell the manufactured articles of a foundry establishment, and to work up the unmanufactured, and sell them for the benefit of the preferred creditors, on the ground that the property conveyed could not readily be converted into money, in any other way, without a great sacrifice.

In De Forest v. Bacon, [2 Conn. 633,] the court sustained an assignment similar to the one just commented on, the jury having found the transaction to be *bona fide*, but asserted that such a provision from its tendency to delay and hinder creditors, was a badge of fraud. But in the two last cases, as well as in the case cited from 5 Ala. it must be observed that the conveyance was to a *trustee*, whilst here, the possession is retained by the grantor, with the right to *use* and convert the personal property into *money*, subject only to an account with the mortgagee, as often as he may be *reasonably* requested. Whatever may have been the intention, the tendency of such a conveyance cannot be doubted, nor its hostility to the rule which must govern in such cases, as laid down by this court in the case of Gazzam v. Poyntz, [4 Ala.

382; that "an assignment by a debtor, can only be sustained where the property conveyed by the deed is, by its terms, fairly and *bona fide* devoted to the payment of creditors, without stipulating for any benefit to the debtor, and where the equitable interests of the creditors are fixed and determined by the assignment itself."

This point, however, does not appear to have been raised in the court below, where the motion decided by the chancellor was made upon the bill and answer, and we will now proceed to consider the case in that aspect.

When a deed, conveying property for the payment of debts, stipulates for the possession by the grantor for a certain time, such possession being consistent with the terms of the grant, is not fraudulent, as against creditors; but if possession is retained after default, and when, by the terms of the deed, the right to it is gone, it becomes a badge of fraud. This is the well established doctrine of this court. [See Magee v. Carpenter, 4 Ala. 469, and preceding and subsequent cases.] Being a circumstance from which fraud may be inferred, it is open to explanation—how is it explained in this case? The right to possession under the deed, ceased on the 1st December, 1841; the bill was filed on the 7th February, 1843, at which time, and up to the coming in of the answers, Ticknor was in possession of all the property, doing business in his own name, selling the goods and merchandise, and keeping his books in his own name. That the stock of goods have been replaced continually by him, under the direction of Day. Indeed, it does not appear that any change whatever has taken place in his business, or the mode of carrying it on since the execution of the deed. Like other mercantile men, he sells his goods and re-invests the proceeds in other goods, which are again sold out, and again re-invested, and it seems that other personal property, the slaves, horses and carriage, have been sold, and the proceeds carried into the stock in trade.

In all this there is nothing which relieves the transaction from the imputation of fraud, arising from the possession after default. It would certainly be a singular anomaly, if a debtor could, by a mortgage or other conveyance, place his property beyond the reach of his creditors, and still use it as a capital upon which to trade in his own name, and this not only during the existence of the mortgage, but for a long period after, by default, he had

ceased to be entitled to the possession. To this Day admits, in his answer, he was privy and consenting, and if the arrangement was not a contrivance to delay and hinder creditors of their just demands, such is its inevitable tendency; and it is, therefore, as against creditors, in law, fraudulent and void.

It is true, it is stated in the answers, that the goods are the property of Day, and that the store is carried on at his risk, and for his benefit. This is probably a mere conclusion of the defendants, from the facts admitted by them, but if considered as a substantive averment of a fact, it is inconsistent with the mortgage, under which he claims, and the other admitted facts. By the mortgage he stipulated, that Ticknor should be entitled to the use and possession, and have the right to sell and dispose of the property, until default made in the payment of the mortgage debt, and until he entered for the default, and sold the property according to the provisions of the deed, he has no title to it. Nor is it pretended in the answers, that the stock of goods which has been from time to time replaced, was purchased by Day, and paid for with his own means—on the contrary, it is admitted, "that the stock of groceries, &c. have been sold and replaced, constantly, by this respondent, (Ticknor,) who carries on the business for said Day, at his risk, and for his benefit." In addition, it is stated, that from the proceeds of the sales, more than $10,000 has been paid to Day, and yet the original indebtedness is not at all reduced; which could only happen by a re-investment of the amount so paid in other goods.

Some stress appears to have been laid upon the general denial in the answer, of the possession of any effects subject to the plaintiff's demand, and upon the denial of fraud, but these are rather conclusions of the parties than facts, and at all events, are countervailed by the admitted facts which stamp the transaction, as one made to hinder and delay creditors of their just demands, and therefore, fraudulent and void.

It results from the view here taken, that the decree of his honor the chancellor, dissolving the injunction, must be reversed.— His refusal to appoint a receiver, was probably the result of the decision he came to, upon the motion to dissolve, but whether such be the case or not, it cannot be reviewed in this court, being a mere interlocutory order, not affecting, finally, the merits of the

case, which could alone give this court jurisdiction. [Kennedy v. Kennedy, 3 Ala. Rep. 434.]

But, as a refusal to appoint a receiver, in a proper case, might operate great injustice, the party aggrieved could doubtless have redress by *mandamus,* or in some other mode, by application to this court.

Let the cause be remanded for further proceedings.