## KING *vs.* KENAN.

### [DETINUE FOR SLAVES, AGAINST SHERIFF.]

1. *Lien of execution.*—An execution, regularly continued from term to term, is a lien on the personal property of the defendant within the county, (Code, § 2456,) from the time it is first placed in the hands of the sheriff.

2. *Validity of deed of trust for benefit of creditors.*—A deed of trust, executed by an insolvent debtor, to his mercantile partner as trustee, who is cognizant of his pecuniary circumstances, for the purpose of securing a debt due to the trustee's wife, arising from the investment of moneys belonging to her separate estate in the partnership business, and the use of the partnership assets by the grantor in payment of his individual debts; which conveys the grantor's residence and household servants, together with his interest in the partnership assets, after paying the partnership debts, then due, or afterwards created; postpones the law-day for more than three years; authorizes the retention of possession by the grantor, and the continuation of the partnership business, until the trust is closed according to its terms; and directs the trustee to settle up the partnership business, if any of the grantor's creditors should attempt to subject his interest therein to the payment of his debts, and to close the trust if default was made by the grantor in the annual payment of interest on the secured debt,—is fraudulent and void as against creditors.—Code, § 1550.

APPEAL from the Circuit Court of Dallas.

Tried before the Hon. NAT. COOK.

THIS action was brought by William J. King, against

M. J. Kenan, the sheriff of said county, to recover a slave named John, with damages for his detention; and was commenced on the 7th November, 1859. The defendant pleaded *non detinet*, with leave to give any special matter in evidence; and issue was joined on that plea. The plaintiff claimed the slave under a purchase from W. B. Milton and M. A. Milton, his wife, on the 1st June, 1859 ; and the defendant, as sheriff, had levied an execution on him, on the 2d September, 1859, as the property of one P. L. Sink, from whom said Milton and wife derived title, as hereinafter more particularly stated.

On the trial, as appears from the bill of exceptions, the plaintiff introduced said P. L. Sink as a witness, who testified, that the slave sued for belonged to him on the 7th July, 1857, and was one of the slaves conveyed by him on that day, by deed of trust, to said W. B. Milton as trustee, to secure the payment of a debt due from him to Mrs. M. A. Milton ; and that on the 21st March, 1859, the debt secured by the deed being unpaid, he sold said slave, with the others conveyed by the deed, to Mrs. Milton, in part payment of the debt, and executed to her a bill of sale. The execution of the said bill of sale and deed was proved by this witness, and both of said instruments were read to the jury. The deed was in the following words :

"State of Alabama, } This indenture, made and executed this 7th day of July, 1857, Dallas County. } by and between Phillip L. Sink, of the first part, William B. Milton (trustee), party of the second part, and Maria A. Milton, wife of the party of the second part, as party of the third part, all of the State and county aforesaid, *witnesseth*, that, whereas the party of the first part borrowed of the party of the third part the sum of $9,624 08, including interest to the 1st day of January, 1858, and, to secure the payment thereof, the party of the first part has this day executed his promissory note for that sum, payable to the party of the third part on the 1st January next, and has also agreed, in consideration of said loan, to execute this deed of trust, as a further security for the pay-

ment of said sum of money, which is the separate estate of the said party of the third part : Now, in consideration of the premises, and for and in consideration of the sum of ten dollars, to the party of the first part in hand paid by the party of the third part, the receipt whereof is hereby acknowledged, before the sealing and delivery of these presents, the party of the first part (the said Philip L. Sink) has granted, bargained, sold, and conveyed, and by these presents does grant, bargain, sell, transfer, and convey, unto the party of the second part and his personal representatives, the following described real and personal property, and choses in action, to-wit: the undivided half of the lot of land in the city of Selma on which the party of the first part now resides, fronting on Dallas street on the south, and on Washington street on the west, containing one acre, more or less, and owned jointly by the party of the first part and one A. H. Lloyd, with the appurtenances thereunto belonging ; also, a negro man named John, about twenty-one years old, a negro woman named Jane, aged about thirty years, a negro woman named Polly, about fifty years, and the natural increase of said slaves ; also, all the accounts, notes and debts of every description, due, or hereafter falling due, or contracted to or with, and belonging to the firm of Sink & Milton, which firm is composed of the parties of the first and second part, and is now doing a mercantile business in the city of Selma ; also, the stock of goods now on hand, or hereafter to be purchased by the said firm for the purpose of carrying on the business in which they are now engaged ; but it is expressly agreed and understood, that the interest in said accounts, notes, claims, debts, [and] stock of goods of said firm, now on hand and to be purchased as aforesaid, and herein transferred and conveyed, is the interest which the party of the first part shall have in them after the payment of all the partnership debts of said firm, now contracted, or hereafter contracted for the purpose of carrying on said partnership business as aforesaid ; *to have and to hold* the above described real and personal property and

choses in action, unto the party of the second part and his personal representatives; and the party of the first part further covenants with the party of the second part, that he is seized as in fee of the undivided half of said lot of land, and that the said real and personal property is free of incumbrances; that he has the title to the same, and the right to incumber and convey the same; and he does hereby warrant the title to the same, unto the said party of the second part, free from the claim or claims of any and all persons whatsoever. *Nevertheless, these presents are upon the trusts, uses, and conditions following,* to-wit: that is to say, the party of the first part, upon paying the annual interest accruing on the sum of money specified in said promissory note, on the 1st day of January, A. D. 1859 and 1860, shall retain the possession of said real and personal property herein conveyed, until the 1st day of January, A. D. 1861; but it is further agreed, that should any creditor of the party of the first part levy on the stocks of goods herein conveyed, or the interest of said Sink in and to the same, or upon the accounts, notes, claims and debts herein conveyed, by garnishment process or otherwise, or should said firm of Sink & Milton be dissolved at any time before the 1st day of January, 1861, upon the happening of any or either of the events above specified, then the party of the second part is hereby authorized to close up the partnership affairs of said firm, and, after paying all the debts of said partnership from the partnership effects, shall apply the share of the party of the first part in the net proceeds of the firm to the payment of said promissory note, should any part thereof be then due; and it is further agreed and understood, that should said promissory note and interest not be paid by the 1st day of January, 1861, then the party of the second part is hereby authorized to take possession of said real and personal property herein conveyed, and may, upon thirty days' previous notice of the time and place of sale given in some newspaper printed in the city of Selma, proceed to sell the same at public vendue to the highest bidder, on cash terms,

Kimg v. Kenan.

or so much of said property as may be necessary to pay said promissory note and interest thereon, or so much thereof as may be due, after first paying the expenses of sale and of this trust; and should the affairs of the partnership not be closed and settled before the 1st day of January, 1861, and the said promissory note, or any part thereof, be then due, the party of the second part shall then, with all convenient speed, proceed to close up the affairs of said partnership, and, after paying the debts thereof as aforesaid, apply the share of said Sink in the net profits to the payment of any amount due on said promissory note, as above provided; but, should the party of the first part fail to pay the annual interest accruing on said promissory note, on the 1st day of January, 1859, or 1860, then the party of the second part is hereby authorized to take possession of the said real and personal property, and proceed to sell said property, and to close up the affairs of said partnership, as hereinbefore provided to be done on the happening of the events before specified, and apply the proceeds to the payment of the expenses and said promissory note and interest, as hereinbefore provided; and whenever said promissory note, and interest that may be due thereon, are paid, from thenceforth the property hereby conveyed, and undisposed of at that time, shall revert and reinvest in the party of the first part, free from the trusts and uses of this conveyance. In testimony whereof," &c.

(Signed by the parties of the first and second part, and attested by two witnesses.)

The only witness introduced by the plaintiff was said P. L. Sink, the substance of whose testimony was as follows: The partnership of Sink & Milton was formed on the 6th October, 1856, and did a general mercantile business, besides buying and selling cotton. By the terms of the articles of partnership, each partner was to put $10,000 capital in the firm, and they were to be equally interested in the business. Sink put into the business a stock of goods which he then had on hand, valued at $18,000; and Milton put in, at different times, about $13,000 in cash, which

belonged to his wife's statutory separate estate, and which he so represented at the time to Sink. At the time this partnership was formed, Sink was actually insolvent, but he was not aware of his pecuniary condition until about the 1st April, 1857. In February and March, 1857, during the temporary absence of Sink in New York, and without his knowledge or consent, the commission-merchants in Mobile to whom Sink & Milton shipped their cotton, and with whom Sink had business transactions prior to the formation of said partnership, applied the proceeds of the sale of cotton belonging to the firm, amounting to over $20,000, to the payment of Sink's individual debts created before said partnership was formed; and in March, 1857, forwarded to Sink & Milton an account-current showing the application of said funds. Sink thereupon made a strict examination into his pecuniary condition, and discovered that he owed about $10,000 more than his property was worth; and he immediately communicated the fact to his co-partner. On balancing the books of the firm, about the 1st July, 1857, it was ascertained that Sink individually owed the firm $9,624 08 more than Milton owed it. Supposing that this sum was due from him to Milton, and being desirous to secure to Mrs. Milton the repayment of the funds belonging to her separate estate which had been invested in the partnership business, Sink executed to her, on the 7th July, 1857, his promissory note for $9,624 08, as for so much money that day borrowed from her by him, payable on the 1st January, 1858; and at the same time, to secure its payment, executed the deed of trust above set forth. Said deed was not executed with any intention on his part to defraud or delay his creditors, but from an honest conviction that it was a debt of honor of high obligation, which it was his duty to secure so far as he could. At the time said deed was executed, no suits were pending against Sink, nor was he threatened with suits by any of his creditors, although many of his debts were then past due and unpaid; and he believed that it was the best possible arrangement that could be made, both for himself and

for his creditors, as it would enable him to acquire means to pay off all his debts from his partnership business. Said deed conveyed all the grantor's property of every description, except about $300 worth of household furniture, and outstanding notes and accounts amounting to about $1,000. After the execution of said deed, Sink continued in possession of the real and personal property conveyed by it, without paying rent or hire, until the 21st March, 1859, when he sold the said slaves to Mrs. Milton, with the assent of her husband, in part payment of the debt secured by the deed, executed to her a bill of sale, and delivered possession to her. The partnership business of Sink & Milton was continued after the execution of said deed as before—goods were bought and sold, and the partners drew from the firm the means necessary to support their families—until the fall of 1858, when the firm was dissolved by mutual consent, Milton taking the stock of goods on hand, valued at $6,000, and agreeing to pay that amount of the partnership debts out of his individual funds.

The defendant read in evidence the record of a judgment recovered by Frothingham, Newell & Co. against said P. L. Sink, in the circuit court of Dallas, on the 18th November, 1858; which judgment was founded on a debt contracted in the spring of the year 1856. An execution on this judgment was issued on the 1st January, 1859, and was placed in the hands of the defendant, as sheriff of the county, by whom it was returned "no property found"; and an *alias* was afterwards regularly issued, which was levied on the slave in controversy on the 2d September, 1859. It further appeared, from the testimony of said Sink, that said slave was in Dallas county while in his possession, and, after the sale by Milton and wife to the plaintiff, was hired as a deck hand on a steamboat running on the Alabama river, and was in said county regularly once or twice every week.

The above being all the evidence, the court charged the jury, that they must find for the defendant, if they believed the evidence; to which charge the plaintiff excepted, and he now assigns it as error.

BYRD & MORGAN, for appellant.
PETTUS, PEGUES & DAWSON, *contra*.

STONE, J.—The folllowing are among the uncontro-
verted facts in this case: That Mr. Sink was the owner of
John, the slave in controversy, up to July 7th, 1857; that
on that day he executed a deed of trust to Wm. B. Milton,
trustee, conveying the slave to him, in trust to secure a
large debt to Mrs. Maria A. Milton; that the slave remained
in the possession of Mr. Sink, in Dallas county, until March
21st, 1859, when, in part payment of the debt to Mrs.
Milton, Mr. Sink conveyed the slave to her by bill of sale,
and the possession then went to Mrs. Milton, who still re-
tained him in Dallas county, until she sold and delivered
him to Mr. King, also of the same county; that before the
said 21st March, 1859, Frothingham, Newell & Co. recov-
ered a judgment, in said Dallas county, against Mr. Sink,
and sued out an execution upon it, and placed it in the
hands of the sheriff for collection; that from that time,
until the slave John was seized by the sheriff of Dallas,
said execution was regularly renewed from term to term,
and kept in the hands of said sheriff; and that, up to that
time, the slave was owned in said county, and was regu-
larly in it at least once a week. On these plain facts, the
execution in favor of Frothingham, Newell & Co. operated
a lien on said slave John, from the time it first went into
the sheriff's hands, unless Mrs. Milton's title can relate
back, and rest on the deed of trust of July, 1857.

[2.] Having premised the foregoing facts, about which
there seems to have been no contest in the court below,
we feel bound to declare, that the testimony in this cause,
if believed, made the case of a conveyance with intent to
delay, hinder and defraud the creditors of Mr. Sink. The
facts connected with the making of the deed, and its pur-
pose, are shown by the deed itself, and by the testimony
of Mr. Sink. The chief features of the transaction are the
following: Mr. Sink and Mr. Milton formed a mercantile
copartnership,—Mr. Milton employing the trust funds of

Mrs. Milton's separate estate in his hands, in supplying his share of the capital stock. The funds of the firm were used in paying the individual antecedent debts of Mr. Sink, by which he became indebted to the firm in some nine thousand dollars. To secure this indebtedness, Mr. Sink executed to Mr. Milton, as trustee, the deed of trust, the chief contents of which will be hereafter stated, for the express purpose of securing said debt of nine thousand dollars to Mrs. Milton, the wife of the trustee. At the time this deed was executed, Mr. Sink was insolvent, and Mr. Milton knew it. The debt of nine thousand dollars, secured by the deed, was made payable the first day of January, 1858.

The deed of trust conveyed the family residence and house servants, three in number, belonging to the said Sink; also, all the notes and accounts due the firm of Sink & Milton; "and also the stock of goods now on hand, or hereafter to be purchased by the said firm of Sink & Milton, for the purpose of carrying on the business in which said firm is now engaged; but it is expressly understood and agreed, that the interest in said accounts, notes, claims, debts, stock of goods of said firm now on hand, and to be purchased as aforesaid, and herein transferred and conveyed, is the interest which the party of the first part shall have in them, after the payment of all the partnership debts of said Sink & Milton now contracted, or hereafter to be contracted for the purpose of carrying on said partnership business as aforesaid." The deed then provides, that Mr. Sink was to retain possession of said real and personal property until January 1st, 1861,—he paying interest on the first of January, 1859 and 1860. The law-day of the deed is fixed at January 1st, 1861,—near three and a half years after its date, and three years after the maturity of the debt secured. There is a provision in the deed, that if any creditor attempted to subject Mr. Sink's interest in the mercantile establishment to the payment of his debts, then Mr. Milton was directed to wind up the mercantile establishment; and further, if Mr. Sink failed to pay the inter-

est in January, 1859, or January, 1860,. then the property; was to be sold, and the trust closed. These are all the stipulations of the deed, necessary to be noted here.

This deed, then, provides for the continued enjoyment, by Mr. Sink of his property for three and a half years, and the continuance of his mercantile business by selling, buy- ing, selling again, and again reinvesting for a like period, without any noticeable change in his business, or the man- ner of conducting it.; this, too, by an insolvent debtor, dealing with one who had notice. of his insolvency. We hold, that the case made by this record is not distinguishable in principle from *Ticknor v. Wiswall*, 9. Ala. 305 ; *Constan- tine v. Twelves*, 29 Ala. 607 ; and *Price v. Mazange*, 31 Ala. 701. In each of those cases, the deeds were pronounced fraudulent as against creditors ; and the present transac- tion must receive the like condemnation.

The charge of the circuit court is strictly in accordance with our views, and the judgment must be affirmed.